UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JOHN PUGLISI,

                              Plaintiff,

          -against-
                                              MEMORANDUM & ORDER
TOWN OF HEMPSTEAD, DEPARTMENT OF              10-CV-1928(JS)(GRB)
SANITATION, SANITARY DISTRICT NO. 2;
SANITARY DISTRICT NO. 2 BOARD OF
COMMISSIONERS; GERARD W. BROWN; JOHN
COOLS; DENNIS J. MEEKINS; BRIAN F.
O'CONNOR; LeROY W. ROBERTS; ROBERT
NOBLE; and MICHAEL McDERMOTT,

                              Defendants.
----------------------------------------X
APPEARANCES
For Plaintiff:      Austin R. Graff, Esq.
                    The Scher Law Firm, LLP
                    One Old Country Road, Suite 385
                    Carle Place, NY 11514

For Defendants:     Joan M. Gilbride, Esq.
                    Cara Ann O'Sullivan, Esq.
                    Laura Baldwin Juffa, Esq.
                    Kaufman, Borgeest & Ryan
                    120 Broadway, 14th Floor
                    New York, NY 10271

                    Julie Ann Ortiz, Esq.
                    Trivella & Forte LLP
                    1311 Mamaroneck Avenue, Suite 170
                    White Plains, NY 10605

SEYBERT, District Judge:

          Plaintiff John Puglisi ("Plaintiff") commenced this

action on April 29, 2010 against the Town of Hempstead

Department of Sanitation's Sanitary District No. 2 (the

"District"), the Board of Commissioners of Sanitary District No.

2 (the "Board"), Gerard Brown, John Cools, Dennis J. Meekins, Brian F. O'Connor, LeRoy W. Roberts, Robert Noble, and Michael McDermott (collectively, "Defendants") asserting claims for retaliation under Title VII, under N.Y. Exec. Law § 296.1(e) (the "New York State Human Rights Law" or "NYSHRL"), and under the First Amendment. Pending before the Court are the parties' cross-motions for summary judgment. For the following reasons, Plaintiff's motion is DENIED, and Defendants' motion is GRANTED.

<u>BACKGROUND</u>[1]

Plaintiff commenced employment with the District in 1973. (Pl. 56.1 Stmt. ¶ 19; Defs. 56.1 Stmt. ¶ 11.) He is still employed by the District and currently holds the position of Sanitation Supervisor--a position that is approved and recognized by New York State Civil Service ("Civil Service"). (Defs. 56.1 Stmt. ¶¶ 11-12.) Plaintiff's duties as a Sanitation Supervisor include, but are not limited to, supervising specific routes that are assigned to him as well as all of the sanitation employees that work on those routes, ensuring that those routes are completed and all trucks are returned, addressing issues raised by his subordinates and by the community at large, and maintaining a daily log. (Pl. 56.1 Stmt. ¶ 25.)

---

[1] The following material facts are drawn from the parties' Local Civil Rule 56.1 Statements ("56.1 Stmt.") and Counterstatements ("56.1 Counterstmt.") and their evidence in support. Any relevant factual disputes are noted.

I.    Plaintiff's Promotion

In or around June 2005, the District created a new in-house position--Lead Supervisor Assistant to the General Supervisor ("Assistant to the General Supervisor"). (Defs. 56.1 Stmt. ¶ 19.) This was a confidential, non-unit position. (Pl. 56.1 Stmt. ¶ 23; Defs. 56.1 Stmt. ¶ 25.) The duties of the Assistant to the General Supervisor were similar to the duties of the General Supervisor and included assisting the General Supervisor in arranging daily work assignments, overseeing the daily operations of the Sanitation and Recycling Departments (i.e., supervising sanitation and recycling supervisors, motor equipment operators, and other sanitation and recycling employees), reporting to the Board and attending meetings, participating in grievance procedures and contract negotiations, and assuming the responsibilities of the General Supervisor in his absence. (Pl. 56.1 Stmt. ¶ 22; Defs. 56.1 Stmt. ¶ 24.) At all relevant times, Defendant Michael McDermott ("McDermott") was the General Supervisor. (Pl. 56.1 Stmt. ¶ 14; Def. 56.1 Stmt. ¶ 10.) Unlike the Sanitation Supervisor position, the Assistant to the General Supervisor position, like all in-house positions, was not recognized or approved by Civil Service. (Defs. 56.1 Stmt. ¶¶ 21-22.)

The District started accepting applications for the Assistant to the General Supervisor position in or around spring

2005 (see Graff Aff. in Support Ex. J), and Plaintiff was appointed to the position on or about September 21, 2005 (Pl. 56.1 Stmt. ¶ 20; Defs. 56.1 Stmt. ¶ 29). With the position came an approximately $7,000 raise and lifetime health benefits. (Pl. 56.1 Stmt. 21; Defs. 56.1 Stmt. ¶ 30.) Because the Assistant to the General Supervisor Position was not recognized by Civil Service, Plaintiff retained the Civil Service title of Sanitation Supervisor and he continued to report to Civil Service as a Sanitation Supervisor. (Defs. 56.1 Stmt. ¶ 32.)

## II. Plaintiff's Investigation of Some Racially Charged Incidents in the District

### A. The Noose Incident

On or about April 19, 2007, a noose was found hanging in the District's garage. (Pl. 56.1 Stmt. ¶ 32; Defs. 56.1 Stmt. ¶ 34.) A group of employees, including Leo Smith, reported finding the noose to Plaintiff who in turn reported the incident to McDermott. (Pl. 56.1 Stmt. ¶¶ 33-34; Defs. 56.1 Stmt. ¶¶ 36-37.) Smith is African American. (Defs. 56.1 Stmt. ¶ 36.) Sometime thereafter, Smith and a few other District employees filed a complaint with the New York State Division of Human Rights ("NYSDHR") concerning the noose. (Defs. 56.1 Stmt. ¶ 38.)

In or around October 2007, Smith, who was a Motor Equipment Operator (or driver) for the District, missed a

mandatory driver-safety meeting. (Defs. 56.1 Stmt. ¶¶ 39-40.) Due to his missing the meeting, McDermott removed him from the driver list for eight days. (Defs. 56.1 Stmt. ¶ 41.) Plaintiff objected to McDermott's suspension of Smith because, according to Plaintiff, white drivers who had missed driver meetings were not similarly disciplined. (Defs. 56.1 Stmt. ¶ 42; Graff Aff. in Support Ex. C, Pl. Dep. 104-05.)

Thereafter, Smith amended his NYSDHR complaint to include a charge of retaliation--namely that he was retaliated against by McDermott for filing his initial NYSDHR complaint about the noose. (Defs. 56.1 Stmt. ¶ 45.) In or around February 2008, NYSDHR held a fact-finding hearing where Plaintiff testified on Smith's behalf. (Defs. 56.1 Stmt. ¶¶ 46-48; Pl. 56.1 Stmt. ¶ 27.) Plaintiff asserts that upon returning home from the hearing, he was confronted by Defendant LeRoy Roberts ("Roberts"), an elected official on the Board, who approached Plaintiff outside of his home and accused him of throwing the District under the bus and providing NYSDHR with "more than [he] had to tell." (Pl. 56.1 Stmt. ¶¶ 75-77.) During their conversation, Roberts' allegedly got a call from Defendant Dennis Meekins ("Meekins"), another elected official on the Board. (Pl. 56.1 Stmt. ¶ 78.) Plaintiff asserts that he could hear Meekins through the phone telling Roberts that "he's gotta go." (Pl. 56.1 Stmt. ¶ 80.) Roberts and Meekins deny

that these conversations took place.   (Defs. 56.1 Counterstmt.
¶¶ 75-80.)

B.   <u>The Fire Truck Incident</u>

On or about March 11, 2008, Defendant Gerard Brown
("Brown"), the Supervisor of the Baldwin Fire District and an
elected official on the Board, reported to McDermott that one of
the District's sanitation trucks had blocked a fire truck's
right-of-way during an emergency call.   (Pl. 56.1 Stmt. ¶ 38.)
McDermott directed Plaintiff to investigate the incident.   (Pl.
56.1 Stmt. ¶ 39.)   Plaintiff did and learned that the sanitation
truck was blocking the street because a school bus was stopped
in front of it.   (Pl. 56.1 Stmt. ¶ 40.)   He also learned that a
person on the fire truck yelled "move out of the way you fuckin
mooley" at an African-American sanitation employee riding on the
back of the sanitation truck.   (Pl. 56.1 Stmt. ¶ 41; Defs. 56.1
Counterstmt. ¶ 41.)   Plaintiff reported this to McDermott.   (Pl.
56.1 Stmt. ¶ 42.)

McDermott, who was also an elected commissioner in the
Baldwin Fire District, conducted an investigation in the Baldwin
Fire Department regarding the use of the derogatory language.
(Pl. 56.1 Stmt. ¶¶ 43-44.)   As a result of the investigation,
Brown wrote a letter to the Baldwin Fire Department.   (Graff
Aff. in Support Ex. R.)   He denied hearing any derogatory
remarks and stated that he believed that the accusation was made

in an attempt to cover-up the sanitation truck's failure to yield to a fire truck's right-of-way. (Graff Aff. in Support Ex. R.) He asked that the "possibility of conspiracy and intentional defamation" be investigated by the Baldwin Fire Department and that legal charges be brought against all persons involved. (Graff Aff. in Support Ex. R.) It is unclear whether any further investigation was performed or if charges were ever brought.

C.    The Use of a Racial Slur

On or about February 8, 2008, Robert Oliveri, a white driver of one of the District's sanitation trucks, complained to Defendant Robert Noble ("Noble"), the Secretary of the Board, that another white employee on his truck, Robert Hachemeister, had repeatedly used a racial slur. (Pl. 56.1 Stmt. ¶ 51.) A few days later, Mr. Oliveri also complained to Plaintiff. (Pl. 56.1 Stmt. ¶ 56.) Plaintiff investigated the incident,[2] found factual support for Mr. Oliveri's complaint, and reassigned Mr. Hachemeister to another truck. (Pl. 56.1 Stmt. ¶ 58.) Plaintiff reported his findings and his disciplinary action to McDermott and Noble. (Pl. 56.1 Stmt. ¶ 59.)

---

[2] It was Plaintiff's duty as Assistant to the General Supervisor to investigate Mr. Oliveri's complaint. (Pl. 56.1 Stmt. ¶ 57.)

III. Plaintiff's NYSDHR Complaint

On or around March 5, 2008, a Board meeting was held where the issue of employees' use of District-owned vehicles was discussed. (Pl. 56.1 Stmt. ¶ 69; Defs. 56.1 Stmt. ¶ 60.) All Sanitation and Recycling Supervisors, the General Supervisor, the Assistant to the General Supervisor, and the Secretary to the Board have use of District vehicles. (Defs. 56.1 Stmt. ¶ 59.) The Board was concerned that employees may be overusing their District-owned vehicles, so they decided that the mileage of all Sanitation and Recycling Supervisors' vehicles would be monitored on a daily basis. (Pl. 56.1 Stmt. ¶ 69; Defs. 56.1 Stmt. ¶ 61.) Plaintiff's daily mileage was monitored, but McDermott's and Noble's mileage was not. (Pl. 56.1 Stmt. ¶¶ 71-74; Defs. 56.1 Stmt. ¶ 63.)

Then, on or about March 22, 2008, Plaintiff was chosen for a random drug test. (Defs. 56.1 Stmt. ¶ 52.) According to the District's policy regarding random drug testing, if an employee is randomly chosen, he is to be notified first thing in the morning and kept in a separate room until he is tested. (Defs. 56.1 Stmt. ¶ 51.) Plaintiff, however, was not notified that he had been selected when he arrived at work, and he was not segregated for testing until later that morning, purportedly in violation of the District's policy. (Defs. 56.1 Stmt. ¶ 54.)

On June 4, 2008, Plaintiff filed a complaint with NYSDHR alleging that he was retaliated against for testifying on behalf of Smith at his NYSDHR fact-finding hearing. (Pl. 56.1 Stmt. ¶ 61.) His complaint stated that the District retaliated against him by monitoring the mileage of his vehicle and failing to properly inform him that he had been randomly selected for a drug test. (Graff Aff. in Support Ex. M.)

IV. <u>Plaintiff's Demotion</u>

In or around October 2007, Plaintiff inquired of Noble as to whether his in-house title, Assistant to the General Supervisor, was a title approved by Civil Service. (Defs. 56.1 Stmt. ¶ 65.) Noble told him that it was not and that his official Civil Service title was still Sanitation Supervisor. (Defs. 56.1 Stmt. ¶ 66; Graff Aff. in Support Ex. JJ.) Plaintiff expressed concern to Noble that he would be subject to criticism if the District was audited by Civil Service, and Noble stated that he thought that "the District, rather than [Plaintiff] personally, would bear any responsibility for the decision to make the in house title." (Graff Aff. in Support Ex. JJ.)

Later that month, Plaintiff sent a letter to Civil Service stating that, two years prior, he has been appointed to an in-house position that was never reported to Civil Service. (Defs. 56.1 Stmt. ¶ 70.) On November 9, 2007, Plaintiff

received a response from Karl Kampe ("Kampe"), the Executive Director of Civil Service in Nassau County, stating as follows:

> Please be advised that referring to a position by a title which differs from an individual's civil service title is permitted. Further, it has been noted that your salary is within the pay range reported to [Civil Service] for your civil service title of Sanitation Supervisor.
>
> Finally, if there is no major difference in the functions that would elevate a position to a higher or different classification, there is no need to notify the Civil Service Commission.

(O'Sullivan Decl. Ex. T.)

Plaintiff followed up with Kampe in a letter dated November 27, 2007 stating that "there are major differences in [his] job functions, duties and responsibilities as Assistant General Supervisor [sic] than what [he] performed in [his] prior position as Sanitation Supervisor." (O'Sullivan Decl. Ex. U.) He also noted that "as a salaried employee, [he is] not entitled to overtime pay or protection by Collective Bargaining Agreements." (O'Sullivan Decl. Ex. U.) Kampe responded in a letter dated December 26, 2007. (O'Sullivan Decl. Ex. V.) Kampe's letter did not address Plaintiff's concern that his in-house position involved more responsibilities and duties than his Civil Service position. Rather, Kampe advised Plaintiff to contact "the management of the District" regarding his

entitlement to overtime pay and coverage under a Collective Bargaining Agreement. (O'Sullivan Decl. Ex. V.)

Plaintiff wrote to Kampe again on March 3, 2008, asking him to "look into the classification of his title" with Civil Service and, if Civil Service determined that he was working out-of-title, to classify his new title. (O'Sullivan Decl. Ex. W.) Around this time, Plaintiff also wrote to the County Executive, Thomas Suozzi, complaining of Civil Service's failure to fully investigate his in-house position. (Defs. 56.1 Stmt. ¶ 75.) Kampe forwarded Plaintiff's letters to Civil Service's classification unit and asked that Plaintiff complete a Position Classification Questionnaire to assist in Civil Service's determination of whether Plaintiff was working within his Civil Service title. (O'Sullivan Decl. Ex. X.) Plaintiff completed the Questionnaire and forwarded it to Kampe on April 10, 2008. (Graff Aff. in Support Ex. I; O'Sullivan Decl. Ex. Z.)

On or about July 1, 2008, Kampe contacted the District to request a meeting concerning Plaintiff's in house position. (Defs. 56.1 Stmt. ¶ 80.)[3] A meeting was held on or about July 3, 2008. (Defs. 56.1 Stmt. ¶ 81.) Present at the meeting were Kampe, Noble, John Morgan (labor counsel to the District), and

---

[3] Kampe did not request a meeting with Plaintiff. (Defs. 56.1 Stmt. ¶ 82.)

Michael Rosenstock (general counsel to the District). (Defs. 56.1 Stmt. ¶ 81.) Kampe informed those present at the meeting that he had investigated Plaintiff's in-house position at the direction of Suozzi and that Assistant to the General Supervisor was not and would not be recognized by Civil Service. (Defs. 56.1 Stmt. ¶¶ 83-86; Pl. 56.1 Counterstmt. ¶ 86.) Thus, Plaintiff's Civil Service title would remain Sanitation Supervisor, and, although he could keep the in-house title of Assistant to the General Supervisor, he had to cease supervising supervisors in any capacity, as such duty was beyond the scope of a Sanitation Supervisor's approved duties. (See Graff Aff. in Support Ex. AA.) Kampe sent a letter to the District dated July 16, 2008, confirming what he represented to those present at the meeting: that the District had to "cease and desist from assigning the duty of 'supervision of supervisors' to [Plaintiff]." (Graff Aff. in Support Ex. AA.) Kampe sent a similar letter dated July 16, 2008 to Plaintiff. (O'Sullivan Decl. Ex. BB.)

On or about July 21 and August 6, 2008, the Board[4] held Executive Session Meetings to discuss the letter from Kampe and decided to eliminate the position of Assistant to the General

---

[4] Present at the meetings were Defendant Board members Meekins, Brown, and Roberts; Defendant John Cools (another elected Board member); and Defendant Brian O'Connor (the Chairman of the Board); as well as Morgan and Rosenstock. (Graff Aff. in Opp. Ex. N.)

Supervisor altogether. (Defs. 56.1 Stmt. ¶¶ 100-01; Graff Aff. in Support Ex. Y (Board Minutes dated August 6, 2008, stating that: "[B]ased upon a letter dated July 16, 2008 from . . . Kampe, ordering a cease and desist the practice of allowing a supervisor to supervisor [sic] other supervisors, the Board has no other alternative but to discontinue the in house position of Assistant to the General Supervisor.")) The Board had Morgan draft a letter to Plaintiff, that Defendant O'Connor signed, explaining the Board's decision to eliminate the position. The letter stated, in relevant part, as follows:

> [T]he Executive Director found that the District was assigning you duties that were beyond the scope of "Sanitation Supervisor."
>
> Mr. Kampe directed the District to "cease and desist," from assigning you these additional duties . . . .
>
> Your only civil service appointment is to the position of Sanitation Supervisor and to comply with the Civil Service Commission's directive, we have no alternative but to reassign you to such position.

(Graff Aff. in Support Ex. U.)

Thus, Plaintiff was returned to his position as Sanitation Supervisor and his responsibilities, duties, salary and benefits returned to what they were prior to his appointment to the position of Assistant to the General Supervisor. (Graff Aff. in Support. Ex. U.)

At some point, Plaintiff amended his NYSDHR complaint to include his demotion, and on January 22, 2010, NYSDHR issued its determination, finding probable cause to support Plaintiff's allegation that he had been retaliated against. (Graff Aff. in Support Ex. NN.)

Plaintiff commenced this action on April 29, 2010, asserting claims against the District, the Board, McDermott, Noble, and Board members Brown, Cools, Meekins, O'Connor, and Roberts for retaliation under Title VII, the NYSHRL, and the First Amendment. (Docket Entry 1.) Pending before the Court are the parties cross-motions for summary judgment.

## DISCUSSION

The Court will first discuss the standard applicable to motions for summary judgment before turning to the merits of the parties' cross-motions.

## I.   Standard of Review

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "Mere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact.").

"The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ." See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)). Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citation omitted). It is under this framework that the Court analyzes the pending motions.

The parties' arguments for and against summary judgment are basically the same. Thus, rather than address each motion separately, the Court will instead discuss the merits of the parties' arguments in their moving and opposition briefs one claim at a time.

## II. Title VII Retaliation

Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are analyzed under the familiar burden-shifting framework first set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 668 (1973). See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010). The plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once the plaintiff has satisfied the elements of his prima facie case, a presumption of retaliation is created and the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citation omitted); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 (2d Cir. 2011). Once such a reason has been presented, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." Hicks, 593 F.3d at 164 (internal quotation marks and citation omitted).

A.   Prima Facie Case

To meet his initial burden of establishing a prima facie case of retaliation, Plaintiff must show that: "(1) [he] was engaged in protected activity; (2) [the District] was aware

17

of that activity; (3) [Plaintiff] suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citation omitted).

### 1. Protected Activity

Plaintiff asserts that he engaged in three forms of protected activity: (1) his participation in the NYSDHR fact-finding hearing related to Smith's allegations of racial discrimination; (2) Plaintiff's filing his own NYSDHR complaint alleging retaliation for testifying on behalf of Smith; and (3) his involvement in the investigation of the three racially charged incidents described above. Defendants concede that Plaintiff's participation in the NYSDHR fact-finding hearing is a protected activity (Defs. Opp. 5 n.2; Defs. Reply 3 n.2), and Plaintiff, in response to a sur-reply letter submitted by Defendants, concedes that his participation in internal investigations is not a protected activity (Pl. June 20, 2012 Ltr., Docket Entry 71, at 1 (citing Townsend v. Benjamin Enters., Inc., 679 F.2d 41 (2d Cir. 2012))). At issue, then, is whether Plaintiff's NYSDHR complaint, which charged Defendants with monitoring his District vehicle and failing to promptly inform him that he was being randomly drug tested purportedly in

retaliation for testifying at Smith's NYSDHR hearing, constitutes protected activity.

Defendants argue that Plaintiff's NYSDHR complaint cannot form the basis of a retaliation claim because no reasonable person could assume that the conduct complained of violated Title VII. (Defs. Opp. 4.) The Court disagrees. "To prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII." Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) (citing Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir. 1986)). Rather, the plaintiff need only have a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Id. (internal quotation marks and citation omitted). It is not disputed that Plaintiff believed in good faith that he was being treated differently as a result of testifying on behalf of Smith. The issue, then, is whether Plaintiff's belief was reasonable. "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1988) (citing Reed, 95 F.3d at 1178). Here, there is at least some evidence in the record that Plaintiff's belief that Defendants' actions were retaliatory was reasonable. (See, e.g., Graff Aff., Docket Entry 46, Ex. NN

(NYSDHR's probable cause determination).[5])  Thus the Court cannot conclude as a matter of law that Plaintiff's NYSDHR Complaint is not protected activity.

It is undisputed that Defendants were aware of Plaintiff's testifying at Smith's NYSDHR hearing and his filing his own NYSDHR complaint.  Accordingly, Plaintiff has satisfied the first two elements of his prima facie case.

### 2.    Adverse Employment Action

Plaintiff asserts that he suffered two adverse employment actions:  (1) his demotion and (2) Defendants' monitoring Plaintiff's mileage on his District-issued vehicle. Defendants do not dispute that Plaintiff's demotion was an adverse employment action; thus, the issue is whether the monitoring of Plaintiff's use of his District vehicle is actionable conduct.

The Supreme Court has explained that an employer's conduct is actionable only if it is "materially adverse":

> The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . .  In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well

---

[5] "[A] finding of probable cause by an administrative agency, such as the EEOC, though not determinative, is admissible to help establish this prima facie case."  Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir. 1985), aff'd, 479 U.S. 60, 107 S. Ct. 367, 93 L. Ed. 2d 305 (1986).

> might have dissuaded a reasonable worker
> from making or supporting a charge of
> discrimination.

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (internal quotation marks and citation omitted); accord Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011). Title VII, however, does not set forth "a general civility code for the American workplace," Burlington, 548 U.S. at 68; thus, "'trivial harms'--i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience'--are not materially adverse." Tepperwien, 663 F.3d at 568 (quoting Burlington, 548 U.S. at 68).

Here, the Court finds that Defendants' increased monitoring of Plaintiff's use of his District vehicle is not materially adverse. Although "excessive monitoring" may constitute adverse employment action, see, e.g., Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 363-64 (S.D.N.Y. 2006), there is insufficient evidence for a reasonable fact finder to conclude that Defendants' actions here would have dissuaded a reasonable employee from exercising his rights under Title VII, see Mendez v. Starwood Hotels & Resorts Worldwide, 746 F. Supp. 2d 575, 597 (S.D.N.Y. 2010) ("[T]he fact that surveillance can be an adverse employment action does not mean that it must be found to be an adverse employment action.").

First, Plaintiff admits that the mileage monitoring is "trivial." (Pl. Mot. 11.) And although relatively "minor acts of retaliation can be sufficiently substantial in gross as to be actionable," Hicks, 593 F.3d at 165 (internal quotation marks and citation omitted), Plaintiff points to no other retaliatory acts to consider in the aggregate.

Second, "[c]ontext matters," and "the significance of any given act of retaliation will often depend upon the particular circumstances." Burlington, 548 U.S. at 69; cf. Hicks, 593 F.3d at 165 ("[C]ontext can diminish as well as enlarge material effect."). Here, there is no evidence that the mileage monitoring might have dissuaded a reasonable worker from making or supporting a charge of discrimination, as Plaintiff was not the only employee subject to the increased monitoring (Graff Aff. in Support Ex. V (stating that the "mileage and gas usage of supervisor's vehicles [will] be monitored on a daily basis until further notice"));[6] Plaintiff was never reprimanded

_____

[6] Plaintiff asserts that he was the only "non-unit confidential" employee whose mileage was being monitored. (Graff Aff. in Supp. Ex. C, Pl. Dep. 131.) However, Plaintiff was also the only "non-unit confidential" employee paying the same rate as the other supervisors whose mileage was also being monitored. (Def. 56.1 Stmt. ¶¶ 61-62; Graff Aff. in Support Ex. C, Pl. Dep. 126-27 (stating that the rate he paid to use a District vehicle did not change when he became a non-unit employee); Graff Aff. in Support Ex. D, Morgan Dep. 85-86 (explaining that he paid more for the use of his District vehicle than the supervisors).) Further, Plaintiff still reported to Civil Service as a

but merely told not to "over-do[] it with using [his] vehicles (Graff Aff. in Support Ex. C, Pl. Dep. 135); and the increased monitoring did not dissuade Plaintiff from filing his NYSDHR complaint, see McWhite v. N.Y.C. Hous. Auth., No. 05-CV-0991, 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008) (finding that the plaintiff's filing an EEOC charge despite retaliatory actions supported the court's conclusion that the defendant's actions were not materially adverse); Vazquez v. Southside United Hous. Dev. Fund Corp., No. 06-CV-5997, 2009 WL 2596490, at *13 (E.D.N.Y. Aug. 21, 2009) (similar).

Therefore, the Court finds that Plaintiff's demotion is the only actionable adverse employment action.

3. Causal Connection

The final element of Plaintiff's prima facie case requires a showing that the protected activity, here Plaintiff's filing a NYSDHR complaint and testifying on behalf of Smith, and the adverse employment action, here Plaintiff's demotion, are causally connected. "[A] causal connection can be established indirectly 'by showing that the protected activity was closely followed in time by the adverse employment action.'" Bucalo v. Shelter Island Union Free Sch. Dist., --- F.3d ----, 2012 WL 3240382, at *8 (2d Cir. Aug. 10, 2012) (quoting Gorzynski, 596

_____

Sanitation Supervisor (Defs. 56.1 Stmt. ¶ 32), and all of the other Sanitation Supervisor's vehicles were similarly monitored.

F.3d at 110). Here, Plaintiff has presented enough evidence to satisfy the causation element of his prima facie case as he was demoted two months after filing his NYSDHR complaint. See Gorzynski, 596 F.3d at 110 (noting that the Circuit has "previously held that five months is not too long to find [a] causal relationship").[7]

However, "[a]n intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference." Nolley v. Swiss Reins. Am. Corp., --- F. Supp. 2d ----, 2012 WL 752155, at *17 (S.D.N.Y.

---

[7] Plaintiff also asserts that Roberts' and Meekins' comments about his testifying at Smith's hearing, his allegedly poor relationship with McDermott, the fact that his demotion letter was drafted by a lawyer, and Brown's letter in response to his internal investigation also establish a causal connection. The Court disagrees. Roberts' and Meekins' comments were isolated and too far removed from his demotion to establish causation. See O'Connor v. Viacom, Inc., No. 93-CV-2399, 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23, 1996) ("Many courts have held that stray remarks in the workplace, by themselves, and without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment."); cf. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination."). His allegedly poor relationship with McDermott similarly does not establish causation. Cf. Boyle v. McCann-Erickson, Inc., 949 F. Supp. 1095, 1102 (S.D.N.Y. 1997) (statements by non-involved supervisors cannot be the basis of a discrimination claim). The Court fails to see the significance of the fact that a lawyer drafted his demotion letter, and Brown's letter is irrelevant now that Plaintiff has withdrawn his claim that his internal investigations are a protected activity, see supra page 18.

Mar. 8, 2012); accord Joseph v. Marco Polo Network, Inc., No.
09-CV-1597, 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010);
Bind v. City of N.Y., No. 08-CV-11105, 2011 WL 4542897, at *17
(S.D.N.Y. Sept. 30, 2011). Here, Defendants argue that
Plaintiff's demotion was the result of his repeatedly contacting
Kampe regarding whether his title was approved by Civil Service-
-not any retaliatory motive. The Court agrees. Plaintiff
admits that his letters caused Civil Service to investigate his
in-house title with the District and that the District had no
intention of conducting its own investigation. (Pl. 56.1
Counterstmt. ¶ 85.) Further, it was Kampe, not the District,
who requested the meeting regarding Plaintiff's title. (Def.
56.1 Stmt. ¶ 80.)[8] And, finally, Plaintiff was demoted only a
few days after the District received a letter from Kampe stating
that Plaintiff could no longer perform the duty of supervising
supervisors. (Graff. Aff. in Support. Exs. AA, U.)[9] The Court

_____

[8] Plaintiff disputes this and asserts that it was the District
that requested the meeting with Kampe. However, the evidence to
which Plaintiff cites does not support this assertion. (Pl.
56.1 Counterstmt. ¶ 80 (Graff Aff. in Support Ex. D, Morgan Dep.
14 (stating that he didn't recall whether the meeting was held
as a result of the District's or Kampe's request)).)

[9] Plaintiff also argues that even if his actions were an
intervening cause of his demotion, Plaintiff should be able to
recover under a theory of promissory estoppel because Noble told
him that he "thought the District, rather than [Plaintiff]
personally, would bare [sic] any responsibility for the decision
to make the in house title." (Graff Decl. in Supp. Ex. JJ.)
However, Plaintiff did not plead a claim for promissory estoppel

25

finds that Plaintiff's own actions have defeated any inference of causation that the temporal proximity may have raised. Thus, as Plaintiff has no introduced any other evidence of a retaliatory motive, he has failed to meet his burden of establishing a <u>prima</u> <u>facie</u> case of retaliation and his motion for summary judgment must be DENIED.

B. <u>Legitimate Non-Retaliatory Reason and Pretext</u>

Even assuming <u>arguendo</u> that Plaintiff established a <u>prima</u> <u>facie</u> case, Defendants have articulated a legitimate non-retaliatory reason for demoting Plaintiff: namely, Kampe's letter demanding that the District cease and desist assigning Plaintiff the duty of supervising supervisors.[10] Plaintiff argues that this reason is pretextual because Plaintiff's demotion exceeded the scope of Kampe's cease and desist letter:

in his Complaint and although "the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." <u>N. States Power Co. v. Fed. Transit Admin.</u>, 358 F.3d 1050, 1057 (8th Cir. 2004); <u>see also</u> <u>Hickey v. State Univ. of N.Y. at Stony Brook Hosp.</u>, No. 10-CV-1282, 2012 WL 3064170, at *5 (E.D.N.Y. July 27, 2012) (collecting cases). Thus, the Court will not consider the merit of Plaintiff's claim for promissory estoppel.

[10] Plaintiff asserts that this is not a legitimate non-retaliatory reason. But Plaintiff's argument is misplaced, as the burden of producing evidence of a legitimate non-retaliatory reason "is one of production, not persuasion" and "can involve no credibility assessment." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal quotation marks and citation omitted); <u>accord</u> <u>Clough v. City of New Haven</u>, 29 F. App'x 756, 759 (2d Cir. 2002).

Kampe's letter did not state that Plaintiff had to cease performing his other duties as Assistant to the General Supervisor, nor did it say that Plaintiff had to be demoted to a position with a lower salary and reduced benefits. (Graff Aff. in Support Ex. AA; see also Graff Aff. in Support. Ex. F, Kampe Dep. 32 ("[W]hatever else they did, they did. It's not at my direction.").)

Defendants do not dispute that Plaintiff's demotion went beyond what was required of Civil Service. Rather, they assert that the District made a business decision to remove the position in its entirety because "[g]iven the Plaintiff's overall duties, to solely eliminate supervision of supervisors and allow Plaintiff to continue as a 'member of the management team' was not practical nor the best use of taxpayer dollars." (Defs. Opp. 18; see also Defs. 56.1 Stmt. ¶ 106 ("If Puglisi could not supervise supervisors, it made no sense for him to remain in the position as all other duties could be performed by a Sanitation Supervisor.").)

When a defendant asserts that it exercised its good faith business judgment in taking some adverse employment action, the Court may "not merely substitute its judgment for that of a business judgment." Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 106 (2d Cir. 1989). However, while a court may not second-guess an employer's decision-making

process, it "is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith" "to ensure that the business decision was not discriminatory" or retaliatory. Id. (internal quotation marks omitted); see also Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985) ("Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, they must also allow employees to show that the employer's demands were illegitimate or arbitrary." (internal quotation marks and citation omitted)). Here, Plaintiff asks the Court to scrutinize Defendants' business decision to eliminate the Assistant to the General Supervisor position; however, he fails to point to any evidence of retaliatory motive.

First, Plaintiff argues that "Defendants' reliance upon the business judgment rule is defeated by the temporal proximity of the purported business judgment." (Pl. Opp. 19.) There are two issues with this argument: (1) Plaintiff's use of the phrase "business judgment rule" is confusing at best, as the "business judgment rule" is a state law principle that shields the actions of corporate directors from judicial review, see Stern v. Gen. Elec. Co., 924 F.2d 472, 476 (2d Cir. 1991); and (2) although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing

a _prima_ _facie_ case of retaliation under Title VII, . . . without more, such temporal proximity is insufficient to satisfy [Plaintiff]'s burden to bring forward some evidence of pretext," _El Sayed v. Hilton Hotels Corp._, 627 F.3d 931, 933 (2d Cir. 2010).

Second, Plaintiff argues that the O'Connor letter, which stated that the District was demoting him because Kampe found that the "duties" (plural) assigned to him as Assistant to the General Supervisor were beyond the scope of his civil service job title, is evidence of pretext because Kampe's letter precluded only one duty--the duty of supervising supervisors. The Court disagrees. The record is replete with evidence that the members of the Board and others present at the Executive Session Meeting all felt that the Assistant to the General Supervisor position was unnecessary if Plaintiff could no longer supervise supervisors. (See, e.g., Graff Aff. in Support Ex. D, Morgan Dep. 16 ("That [i.e., supervising supervisors] was the main thing we were concerned about; that was the only reason it was an in-house title that he was in."); id. at 22 (stating that he believed that "supervising supervisors is a rubric for the job assistant general supervisor"); Graff Aff. in Support Ex. BB, Roberts Dep. 34 ("He's [the general supervisor's] assistant, so when he couldn't do that [i.e., supervise supervisors], what was--what was his job going to be? We had enough supervisors.

We needed an assistant supervisor to supervise the supervisors.").) Further, all of the functions of the Assistant to the General Supervisor beyond supervising supervisors Plaintiff could have performed as a Sanitation Supervisor. (Def. 56.1 Stmt. ¶ 95; Pl. 56.1 Counterstmt. ¶ 95.) So there was no justification for maintaining the title Assistant to the General Supervisor or for paying Plaintiff an increased salary with better benefits. Finally, the position of Assistant to the General Supervisor was eliminated in its entirety (i.e., Plaintiff was not merely replaced); thus providing support for Defendants' argument that Plaintiff was demoted because his position was no longer needed and not because of some retaliatory animus.

The Court, interpreting the evidence in the light most favorable to Plaintiff, finds that no reasonable jury could find that Defendants' proffered reason for demoting Plaintiff was pretextual. Accordingly, Plaintiff's motion for summary judgment on the Title VII claim is DENIED, and Defendants' motion is GRANTED.

III. Retaliation in Violation of N.Y. Exec. Law § 296.1(e)

Plaintiff also asserts that he was retaliated against in violation of NYSHRL. Retaliation claims brought pursuant to the NYSHRL are analyzed under the same legal standard as claims brought under Title VII. See Cruz v. Coach Stores, Inc., 202

30

F.3d 560, 565 n.1 (2d Cir. 2000).  Therefore, Plaintiff's NYSHRL
retaliation claim is DISMISSED for the same reasons that his
Title VII retaliation claim is dismissed.

IV.  First Amendment Retaliation

        Finally, Plaintiff asserts a claim for retaliation in
violation of the First Amendment.  In order to state a claim for
First Amendment retaliation, a plaintiff must plead and prove
that: "(1) his speech addressed a matter of public concern,
(2) he suffered an adverse employment decision, and (3) a causal
connection exists between his speech and that adverse employment
decision, so that it can be said that the plaintiff's speech was
a motivating factor in the adverse employment action."  Cioffi
v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162
(2d Cir. 2006) (citation omitted).  If a plaintiff satisfies
this initial burden "of showing than an improper motive played a
substantial part in defendant's action," then the burden "shifts
to defendant to show it would have taken exactly the same action
absent the improper motive."  Scott v. Coughlin, 344 F.3d 282,
288 (2d Cir. 2003) (citing Mt. Healthy City Sch. Dist. Bd. of
Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d
471 (1977)).  Thus, "[r]egardless of the presence of retaliatory
motive, . . . a defendant may be entitled to summary judgment if
he can show dual motivation, i.e., that even without the

improper motivation the alleged retaliatory action would have occurred." Id. at 287-88.

Here, for the reasons discussed above, see supra Section II.A.3, the Court finds that Plaintiff has failed to establish a causal connection. See Lore v. City of Syracuse, 583 F. Supp. 2d 345, 382 (N.D.N.Y. 2008) (noting that the causation element of a prima facie case of retaliation under the First Amendment and Title VII are the same). Accordingly, the Court need not discuss the other elements of Plaintiff's prima facie case.[11]

CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED, Defendants' motion for summary judgment is GRANTED, and, accordingly, Plaintiff's Complaint is DISMISSED in its entirety. The Clerk of the Court is directed to enter judgment consistent with this Memorandum and Order and mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:     September 17, 2012
           Central Islip, NY

---

[11] Even if Plaintiff had satisfied his initial burden, Defendants have established that Plaintiff would have been demoted regardless of whether he testified at Smith's hearing or filed his own NYSDHR complaint. See supra Section II.B.